First matter is U.S. v. Tyrone Mitchell. Okay. Okay. I'm sorry. On account eight, the government charged Mr. Mitchell with possessing a .357 revolver at the Carlisle location. The basis for the 924C was that this gun was possessed in connection with a drug crime, and that drug crime is identified in the indictment as the possession with intent to distribute crack cocaine. And it's the defendant's position that there was insufficient evidence. What happened in this case was that after law enforcement surveillance at a local level, the Attorney General's investigators obtained a search warrant and executed that search warrant on two locations on July 21, 2010. One of those two locations was the Carlisle address. When they arrived at that address, they saw Mr. Mitchell. Let me focus on that particular evidence, and I apologize, I had forgotten in the beginning, if I may reserve three minutes for rebuttal. Okay. Thank you. So the government focused on evidence in what was described as the second-floor front bedroom, and what was found in the second-floor front bedroom was as follows. There was a photo. In that photo, it was a candid photo, and it was a picture of Mr. Mitchell and another person who was not identified. There was ammunition that fit the gun. The .357 ammunition was also found in that room, and marijuana was found in that room. I thought the .357 was found in the bottom of the chair. It was found in the room? No, the ammunition. The ammunition was in the room. The importance is the gun is found in a Lazy Boy-style recliner in what would be considered the living room. Was knowledge of the gun, the issue of knowledge, presented to a jury? In other words, did Mitchell know that there was a gun in the house? There is absolutely no record to suggest that he had knowledge of that gun. One witness, Alfred Jenkins, was asked if he had ever seen a gun at any of those locations. And his response was that the only place that he had seen a gun was at the First Street location. Is the best evidence that he actually had a key to the house? He did have a picture, and his picture was inside the house in various places. So there is one photo. I think that what's important is that there actually are some factual errors in both the district court's opinion with respect to this issue and the government's brief. The government's brief suggests that there were cocaine and crack also found in that room, which is inaccurate. It is accurate. And that's important, because this is possession of a weapon in connection with a crack cocaine offense. You say that constructive possession doesn't work here. You have to have direct proof of possession. Some circumstantial or direct evidence of knowledge. And I think that too much evidence is taking place in the photo. Isn't this plain error review as to that? No, it's not. That issue was raised. It was raised in post-trial according to Rule 29. And the government wrote a written opinion. We submitted that opinion as a special appendix, because it was under seal. Okay. Post-trial. It wasn't objected to at the time of trial. No, it wasn't. But under Rule 29, it permitted to move at three different stages. You've got the two, excuse me, cooperating witnesses who testified and established a nexus between Mitchell and the gun at the other two properties. And I realized that his wife had an ownership interest, or her company did anyhow, in his other two properties. But you've got direct testimony which would establish the necessary sciento or link or intent for aiding and abetting regarding the guns at the other two residents. They see him coming into the residence using a key. So there's some kind of control over the premises. We wouldn't have a key to it. Pictures in the rooms. Why isn't that enough? For a few reasons. One, with respect to the picture. It is a picture of him and someone else. There's no evidence that that means it belongs to him. It's not a lock. It's truly not a slam dunk. Because Warren Lawson is his uncle. Someone identified as Darryl is either a nephew or a cousin. And there was also a woman found at that apartment at the time of the execution of Search Warrant who was let go. So you have all these people here, including relatives. And obviously there's testimony that they're dealing drugs together. So that picture couldn't belong to anyone. Can you clarify one thing for me? A gun was found in two properties. A gun was actually found in three properties. Are you now referring to Carlisle? I'm only referring to Carlisle. And the question about whether or not you can use the possession of a gun at other properties, I would say you absolutely cannot. There was no 404B motion practice here. It's clear propensity evidence. This case was the indictment really joins three very different sets of crimes. So it can't be that. Why are there different sets of crimes? They're all basically drug possession with intent or actual distribution, I think. They are that. But they involve different people at different locations. And the search warrants are executed at different times. But the essence of the crime is the same. It's stealing, selling drugs. That's true. And I don't believe the joinder was actually challenged. But even if something can be joined, I don't think that that means that you can use evidence of possession of a gun at one location to support possession of a gun at another location. And for the sake of argument, if I can take from your faces, if you disagree with me, then what's important about this location is where the gun is found. Warren Lawson, who lives there, and there's proof of utility bills and whatnot, is sitting in a chair. The gun, he is immediately removed from the chair. But we don't know that the picture belongs to him. Another error I'd like to point out in the government's brief is that they say that his property is found in that room, including the photo. The testimony was the officer who was asked, they didn't find any clothing that he was aware of. There's no evidence that any property belonging to Mr. Mitchell was found in that bedroom. There was one photo. He lived in one of these houses, didn't he? Was it the Goodman house? The first house had the most mail that would be addressed to him, utilities and things like that. There was, at the Goodman location, there was a takeout receipt that said Fox, as if that was the person who ordered it, that was a nickname of Mr. Mitchell's. Can you point to which of these three houses he stayed at the most? I think that the testimony was that he would have stayed at the first house the most because of the fact that there were clothes there, because that there were utilities bills there. But I don't know that there was actual testimony of where he stayed. But there was no surveillance. To go back to Judge McKee's question earlier, that he had a key to this house. He had a key to the Carlyle house where this gun was found. And his picture was upstairs. You're saying he doesn't stay there at all. There's no evidence that he stays there. He wants the jury to infer from the fact that he has a key and he lets himself in with a key. Well, I think if we assume that the jury could infer that, even then, there's no knowledge that he would know that Warren Lawson has a gun. We don't know how did the gun fly out of the chair. You said Lawson has the gun. That's really the question. Yes. Maybe they both had it. Well, but there's no information. We know Warren Lawson had it. It's listed as a related case. He pleaded guilty in Philadelphia court to that crime. But we don't know if Warren Lawson had that on his person and shoved it into the chair as the police were coming in. We don't know if it was placed in the chair earlier. They could not use the locate the guns and the other two properties and infer from that. Maybe it's a four or four B theory. There was no I did not see in the record. I wasn't trial counsel, but my review of the record was that there was no request to not use it. But they certainly were given the standard charge when multiple counts are charged that you're only to include the evidence relevant to that count. Doesn't really answer your question. But that's other crimes evidence. And that has to be resolved before you get your yellow light on talking about the charge. What about the Rosamond problem? Do you think that the jury instruction on aiding and abetting was adequate in requiring advanced knowledge of the gun? I don't because the charge permitted the jury to either decide that he had advanced knowledge, knowledge of the crime or knew contemporaneously that he knew a crime was being committed as it occurred. And because it offered both alternatives, the jury could have chosen. The government has argued that on these facts, there's no way they could have found the knowledge at the time of its occurrence. And so therefore, the government argues there's no plain error. It's difficult because we've raised sufficiency for me to suggest how either could be proved. But what we do know is that Mr. Mitchell left the house immediately was arrested and then other law enforcement immediately enter and find the gun. So I think that a jury could infer. I don't think the evidence is sufficient, but there's certainly if there was, say, for example, if Mr. Lawson had testified that he knew there was a gun there, it's certainly possible that Mr. Lawson showed it to him for the first time moments before he left. And then you have it at that same time. The Rosemont case requires actual evidence that that gun is going to be used in connection with the drug offense and that he knew it in advance. Yes. And you say the the charge was was incorrect or improper in regard to Rosemont? It was. Could you distinguish it for me? Why was because it permitted two alternatives, either that the charge, which I put forward on page 28 of my brief, requires either a defendant knows that the crime was going to be committed or was being committed. And so the being committed is in the moment as opposed to having advanced knowledge that the crime would be committed. And I think that that's why. Oh, that's the distinction. I see that my time is up. We have some time. I want to ask about the sentencing issue to look into that when you come back. OK, thank you. Good morning. May I please support Robert Salzman on behalf of the government with respect to this efficiency issue? The most important thing, as always in these matters, is the standard overview, which we know is very differential. No question that what my friend, Ms. Van Hook, says could very well be true. Lawson's acting on his own. The picture just landed in the room. The ammunition for the gun happens to be in the same room as the picture. Mitchell has nothing to do with this. It's possible. But of course, we have to accept all inferences to favor the verdict. And there are clear inferences that favor the conclusion that this was that Mitchell was involved in the possession of this gun, either on a constructive possession theory or as aiding and abetting. Could you say it's plain error, particularly in light of the Rosemond decision that the Supreme Court has issued? So with respect to the jury instruction, there were actually multiple errors in the aiding and abetting instruction in light of Rosemond that mostly favored the defense as opposed to the government. The mistake that favored the government, perhaps, was not making clear that the knowledge has to be advanced, which is what Rosemond says. Not exactly what Rosemond says. Rosemond says you have to have advanced knowledge of the gun or knowledge at the time the crime is being committed at a time that you can still withdraw. That it was going to be used in connection with the drug crime. Exactly. And so that was mistaken. But at the same time, in giving the old Third Circuit and pre-Rosemond instruction, the instruction favored the defense in saying that the government had to prove that the defendant knowingly assisted in the crime. The crime being the 924C offense, the possession of the gun. What Rosemond makes clear is that an aider and abetter with respect to a 924C charge does not have to do anything with regard to the gun. That aiding and abetting the drug crime by itself is enough so long as the defendant has that advanced knowledge. So this was a very favorable instruction for the defense. Nevertheless, if it has a fatal flaw, the fact that it is favorable in other aspects does not cure the fatal flaw, right? Oh, absolutely, Your Honor. But this is not a fatal flaw because in this case, there is no way that the jury can convict on the theory that Mr. Mitchell only knew about the gun at the time it was seized because he wasn't there. Any conduct that he would have taken on which they relied in finding him guilty had to take place before. Now, to be clear here, we're only dealing with two of the counts on this issue, which are Counts 8 regarding the Carlisle Street and Count 16, which involved First Street. Count 12, which is the other 924C conviction that involves Goodman, he was not charged with aiding and abetting for that because the Goodman property was empty. There was nobody to aid and abet. Count 8, the jury had a question on aiding and abetting. So does not that indicate that perhaps this flaw in the instruction was confusing the jury about how they should decide on whether there was advanced knowledge or not? The jury asked for the instruction on aiding and abetting to be reread and the judge reread it. And there was no further question that I can recall after that. But again, with regard to Carlisle Street, Mr. Mitchell has just left the property. He has a key. He's not there. The police go in and they find Lawson and they find this gun. By definition, if he had knowledge and the jury found he had knowledge because they were instructed to find that, if he had knowledge, it had to be before the crime was committed, which is the instant that they find the gun. And so Rosemond is satisfied. Add to that that we're on plain error review because there was no objection to the jury instruction. This is not plain error. There is no chance that this was... No, Ms. Van Hoek very correctly said that the sufficiency challenge was preserved. But there was no objection to the aiding and abetting instruction during trial, post trial at any time until it came before this court. So was there an error here that affected the verdict? And of course, it's the defendant's burden on plain error review. And the answer is no, because there is no way that the jury didn't find advanced knowledge given that he's not there and he's left the property. There's no way that the jury didn't find advanced knowledge. The question really is, did the government prove that he had advanced knowledge that a gun would be used in connection with the offense? And the answer I submit, Your Honor, is yes. And this gets back to the sufficiency claim. It's his stash house. It's his uncle who's sitting there selling drugs. Jenkins testifies. Where's that coming from? Well, the fact that he has the key and that Jenkins has testified. Is your argument that the jury could have inferred these things or is your argument that, yes, the government proved this offense, that he had advanced knowledge that a gun would be used in connection with drug offenses? My argument is the government presented sufficient evidence for the jury to conclude, as it did, that he had knowledge. And that knowledge necessarily was advanced knowledge, given that he was not there when the gun was possessed. Jenkins is the key witness here. He says that he bought drugs from Mitchell in this house and from this house. The police also did their own undercover purchases from Mitchell at this location. But Jenkins says he bought drugs there and that when Mitchell was not there, Mitchell told him, buy it from Lawson. He'll take what he called his uncle. Buy it from his uncle. He'll take care of you. And he did. So a reasonable jury relying on that, then finding that Lawson is the guy there with the gun at the time, can reach that conclusion. There was no question to the jury in that regard, was there? No. I just want to quote for you the language from Rosemont and see if you satisfy this. The government makes its case by proving that the defendant actively participated in the underlying drug trafficking offense with advanced knowledge that a confederate would use a handgun during the crimes commission. That's very specific language. But your argument is that the jury could certainly have inferred that. Yes. Well, the first part of that, there's no dispute here that the government proved that Mitchell participated in the drug crime. And so what's left is, did he have advanced knowledge that a gun would be used? And given the fact that Lawson is sitting there doing the sales with a gun, that Mitchell has the key to the property, the ammunition is in his bedroom for that gun, yes, the jury can make all the necessary inferences. I also haven't mentioned the two other locations. The Goodman Street property is searched on the same day, and there's no one else there at Goodman. And there's a gun, again, strategically positioned near the front door. Whether you look at this as 4-4-B or not, there was no objection. Certainly the jury can infer knowledge and intent and plan here. First Street, and here I would correct my friend a bit, the first search is a year later. She said that he primarily lived at First Street. That's true a year later, and it's Black who's the witness on that, who explains when they moved in. But at First Street, same thing. Black has a gun. He's sitting there. It's in the couch. Black says, this is Tyrone's gun. He's asked, whose gun is this? And he says, quote, Tyrone's, because he gave him the money for it. So a jury can look at all of this and see he's doing the same thing over and over in these different locations. He has the knowledge that a gun is there to protect the drugs right next to where the sales are being committed. I don't see this as a difficult case. As far as the Roseman mistake, it's just not relevant, given that he was not there. Roseman is a case in which people are literally running in the street and one person pulls out a gun and fires. Before your time runs out, could you comment on Judge McKee's reference to the judge's reference to Mitchell's arrest record? Countless times he mentioned, it almost seems like he factored in an arrest record at the time that he imposed. He went through every single arrest. So first, this also is on plain error review. There was no objection here. What he did was he read the pre-sentence report. He just literally read the 15 or 18 arrests. I don't know what anyone did to you, but I know what you did, including what you got away with. That's a remarkable statement for a judge to make, and he sentences him, a 50-year-old man, to 85 years in prison, based in part, we must assume, for what the guy got away with. What are we supposed to do with that? We can't ignore it. We can't ignore it, but I think that this case is basically a replay of the Ferguson decision, which was decided after the sentencing in this case. The prior arrests were considered, they weren't necessarily relied upon, and Judge Hardman didn't write the opinion to suggest that the district court can rely upon a bare arrest record. Well, Ferguson is really very, very similar. Same judge, same practice of just listing out the arrests. And in that case, what the judge says is he says you have one, two, three, four, five arrests for burglary, etc. And then immediately says it appears that the defendant is incapable of abiding by the law. So it's really the same situation. It's hard to separate that conclusion from the finding of various arrests. Well, but in this case, you have an extreme criminal record. He's not abiding by the law because he keeps getting arrested all the time. Wait, so what I just read, the abiding by the law, is from Ferguson. And this court rules that it will not infer from that on plain air review that the judge relied on those arrests as opposed to citing the arrests. But here we clearly did rely upon it. Well, but here we similarly have one somewhat ambiguous line that the judge says. But we also know that he's relying on this extreme criminal record of multiple robberies, federal drug conviction. Basically, Mr. Mitchell, unfortunately, has been in custody all but a few years of his adult life. And here on probation, he commits these new very serious offenses. So this is not the Berry case or Mateo Medina. Mateo Medina, by the way, was decided by this exact panel on the same day the sentencing of Mitchell's case took place. So what the judge knows at that point is what's in Berry, which is that... The same thing, just elaborated upon in Mateo. Sure, but Berry involves a case in which the guy had no convictions. He just had arrests, and the judge says, well, we know you got away with this because there must have been some breakdown in the court system. The judge says nothing like that here. Instead, he recites from the PSR the entire criminal record, but there's no clear indication that he relies on the arrests. I'm troubled by it, knowing you as I do and how professional you are. I can't help but think that you're troubled, you know, your prosecutor by a judge saying, I know what you got away with. Plus, why not just demand it? I mean, knowing the judge, he might knock a day off of it. But at least to vindicate the process. I'm reminded, actually, I was thinking about this morning where we read this years ago when my kids were playing softball. You know, they went to a Quaker school and the idea is to win, but make the other team look good. And my daughter asked the coach, how much did they win by? And the coach said, you won by enough. Well, you got 85 years on this guy. Even if it goes back, you're going to get enough on him. And it just seems like we need to do something in a context where a sentencing judge says, I know what you got away with. Well, certainly you're in charge and that would be the decision. I don't think I need to. But my job is to try to apply the law and advocate to the court what we believe the law is. Certainly we do. We will want courts not to rely on arrest records. I can tell you that after Barry and after Matteo Medina, I instructed every prosecutor in my office regarding the decisions and to be aware of this and to see that it doesn't happen. Fortunately, what we do makes a difference. This is heartening to me. It's the news. And as a result, we don't have many of these cases. And when you come to argue a case, we always pay special attention, too. We do. Well, thank you, Your Honor. I appreciate that. But here, sure, it's an incredibly long sentence. It's going to be incredibly long, whether it's remanded or not. I just have to faithfully argue based on precedent that this looks to me exactly the same as Ferguson. And therefore, we defend the sentence here. Will we complain tremendously? Of course not. You get a good life sentence no matter what we do. Sure. That would seem likely, given that he's 50 years old or more and he's committed perhaps his entire adult life. That's very true. But I just read the Ferguson decision as being the same. And that's what we rest on. Thank you very much, Your Honor. Thank you. I'm compelled in the beginning to correct something in the court's exchange with my adversary. The judge did not say. He calls you his friend. What is that? You slept better than he did. He slept better than you did. No, no. The court did not make the comment that Your Honor repeated to the government's attorney. Which commented sentencing. Yes. And let me explain. You're quoting something from my brief. And and in my brief, I explain and I'll take it back. Mr. Mitchell allocutes. And when he allocutes, he reads a long letter. And in that letter, he talks about being a victim of crimes of society that he lived in. But didn't the judge then say, I don't know what someone did to you, but I know what you did, including what you got away with. No, I will tell you what I do is I quote what the judge said. And then later I have that in quotes. And then later I say the intended meaning of the court's response was just as clear. And then I use a single quotation and I apologize. So that was my interpretation. So let me tell you what he actually specifically said. What page are you on? I'm on page fifty four of my brief in the middle of the block quote. He did. He did reference what I have here, extensive criminal record without distinguishing between arrest. He absolutely did. But I just feel compelled to explain because I don't want my brief to be misinterpreted to my advantage. Obviously, I'm not sure what the defendant was referring to when he talks about crimes committed against him. But I certainly know the crimes he is convicted of committing and the crimes he was adjudicated delinquent for committing, as well as the crimes he was arrested for. So that's what he says in response to my client saying I'm a victim of crimes. He says, I don't know what you're talking about, but I certainly know this list of convictions, adjudications and arrest. And that's my interpretation. I'm looking at page fifty four of your brief. I don't see the quote you're referring to. The indentation is what the judge said. That's what I get for using an adobe in that. This is page 14, 16 of the appendix. And I do appreciate that. That's helpful. Thanks. So so I think that's enough, though. What we have here might make it more like Ferguson. That might make it more like Ferguson than Matteo. I believe that it does not. I think Ferguson is distinguished in the first instance. The U.S. attorney mentions Mr. Mitchell's criminal history. In response, the court actually interrupts the presentation to add a reference to all of his arrest. That that's significant enough to lob that on. And then, of course, he does the recitation of 18, which dwarfs obviously the number of his arrests, which are six. And of the 18, actually the last two are really this case. So we have no facts on any of his arrests. It's a bare arrest record except for the last two. And those facts are that they're redundant because they are the federal counts. And then he describes this package, these six. He has some juvenile adjudications for which he received probation many, many years ago. There are no records. And six adult convictions and 18 arrests. And says this is the worst record he's seen in his 12 and a half years on the bench. And when you actually parse out from that group what the arrest is, it seems impossible to conclude that he wasn't basing that opinion on more than just the actual convictions. He has three adult convictions that were more than 30 years old, two of which he had received probation for. The other, he had an 11 to 23 month indeterminate sentence. Those, that's the 30 year group. The ones that are in the next 30 years, he had a robbery and a drug conspiracy, which is why he qualified for a career offender. And in the middle of that, he had a simple possession in the local Philadelphia court and received a probation. You're saying his record's not all that bad? No. To suggest that it is among the worst records one has seen, and that's what it is, it's nine criminal history points. It's 30 year old cases that have probation. And a simple possession. So I think that that's why... Even that might be one of the worst that this judge has seen. I doubt it, but it's possible. But unfortunately, it doesn't seem like... It's certainly not the worst record I've seen by a long shot. That's not the worst I've seen either, unfortunately. So that's the second time, that's the second reference. Or the third, really. Well, your red light is on. Mr. Zaltzman kind of ceded some of his time because he stopped when his red light was on. I don't want to cut you off mid-sentence at this point. You feel compelled to make. Just in conclusion, I think that reliance can be implicit. What is your argument under plain error review? So the error, I think, has to be clear and obvious, which it is because the very decision was decided a decade earlier, more than a decade earlier. And then it has to affect substantial rights. And if substantial rights... This isn't the case of, well, he received a guideline sentence, so it doesn't matter. Because in Barry, it was considered plain error with a guideline sentence. And in Mateo Medina, there was actually a downward variance or departure. And it was still affected, it prejudiced the defendant. And the rationale in those decisions is that you can't unring the bell. It can certainly influence, once you've considered it, it influences your 3553A analysis, even if you end up in a guideline sentence. And then with respect to the last factor for plain error, I think that it's hard not to conclude that this doesn't impact the integrity of judicial proceedings. Because this is a person who walked away with an 85-year sentence. 55 years for the stacking of the 924C, but also another 30. 55 is probably a life sentence. And so in that way, I think that you have to think that that impacts the integrity of the system. Thank you very much. I think both of us have a very fine argument. Excellent job, and I really do appreciate your candor. It's wonderful to see an advocate come in and present us with that kind of candor. And we expect that as a Mr. Zossmer, he never disappoints, but we will see him again tomorrow. But we appreciate your candor and the professionalism of both of you.